CLERK'S OFFICE
A TRUE COPY
Sep 26, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplic 

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| **Information associated with Target Cell Phone 1, as more fully described in Attachment A-3** | ) Case No. **24-M-497 (SCD)** |
|  | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     10-10-24     *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. Stephen C. Dries     .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for   30   days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     9-26-24. 1:30 pm                              *Stephen C. Dries*
                                                                          *Judge's signature*

City and state:     Milwaukee, WI                    Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                                          *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

### Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-3

### Property to Be Searched

1.      Records and information associated with the cellular device assigned **262-993-0926** ("Target Cell Phone #1"), that is in the custody or control of US Cellular (the "Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.      Target Cell Phone #1.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachments A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachments A:

a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period from March 26, 2024, to the date of this warrant:

   i.   Names (including subscriber names, user names, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well specialized location data including LOCDBOR, Timing Advance, RTT, or similar.

b. Information associated with each communication to and from the **TARGET CELLULAR DEVICES** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELLULAR DEVICES** will connect at the beginning and end of each communication, as well as specialized location data including LOCDBOR, Timing Advance, RTT, or similar.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phones.

c. Information about the location of the **TARGET CELLULAR DEVICES** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

3

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of Title 18, United States Code, Section 922(o), and Title 21, United States Code, Sections 841, 843, and 846, involving Malik Nichols, Dominique Williams, Jerold Campbell, Europe James, Andre McKee, Anthony Hanes, Devin Eiland, Charles Brown, Chauncey King, and other unidentified subjects during the period from March 26, 2024, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means



CLERK'S OFFICE
A TRUE COPY
Sep 26, 2024
s/ Marlili Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 24-M-497 (SCD) |
| Information associated with Target Cell Phone 1, as more fully described in Attachment A-3 | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o); 21 U.S.C. §§ 841, 846 & 843(b) | Unlawful possession of a machine gun; Distribution of controlled substances; Possession of controlled substances with the intent to distribute; Conspiracy to distribute controlled substances; and Use of a communication facility to distribute controlled substances. |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _30_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Jacob Dettmering
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: __9-26-24__

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jacob Dettmering, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location data (described more fully in Attachment B) associated of the following cellular telephones, defined collectively here and in the Attachments A as the **TARGET CELLULAR DEVICES:**

- Target Telephone 1, believed to be used by **Malik Nichols**, assigned call number **(262) 993-0926**, and serviced by US Cellular;

- Target Telephone 2, also believed to be used by **Malik Nichols**, assigned call number **(414) 416-8334**, and serviced by T-Mobile;

- Target Telephone 3, believed to be used by **Dominique Williams**, assigned call number **(262) 307-3681**, and serviced by Verizon;

- Target Telephone 4, believed to be used by **Jerold Campbell**, assigned call number **(414) 745-1857**, and serviced by T-Mobile;

- Target Telephone 5, believed to be used by **Europe James**, assigned call number **(414) 748-1145**, and serviced by AT&T;

- Target Telephone 7, believed to be used by **Andre McKee**, assigned call number **(414) 737-2265**, and serviced by T-Mobile;

- Target Telephone 8, believed to be used by **Anthony Hanes**, assigned call number **(262) 388-1394**, and serviced by AT&T;

- Target Telephone 9, believed to be used by Devin Eiland, assigned call number **(414) 499-6083**, and serviced by **T-Mobile**; and

- Target Telephone 10, believed to be used by **Charles Brown**, assigned call number **(470) 208-8160**, and serviced by Verizon.[1]

---

[1] The government is not seeking legal authorization related to the device denominated below as "Target Telephone 6," as its suspected user (Chauncey King) is now in custody. This affidavit nevertheless discusses certain evidence related to Target Telephone 6 because that evidence is relevant to the probable cause analysis for other devices named in the instant request.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phones.

4. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 7, 2018. I was assigned to the FBI Capitol Area Gang Task Force (CAGTF) in Baton Rouge, Louisiana, from June 15, 2018, to April 1, 2020. Since April 1, 2020, I have been assigned as the Task Force Coordinator for the Milwaukee Area Safe Streets Task Force (MASSTF). I graduated from the FBI Academy in Quantico, Virginia, in 2018 and have over six years of federal law enforcement experience. I have been involved in the enforcement and investigation of numerous violations of federal law, to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law. I have used investigative techniques, including but not limited to: consensual monitoring, physical

2

surveillance, witness and subject interviews, court authorized electronic surveillance, review and analysis of telephone records, and the execution of search and arrest warrants. I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of controlled substances laws, to include violations of 21 U.S.C. §§ 841, 843(b), and 846, as well as other violations associated with the trafficking of controlled substances. I have participated in numerous drug investigations utilizing various means of investigation, including but not limited to the execution of search warrants, the use of subpoenas, and the use of informants. Additionally, I have training and experience in relation to firearm investigations, and that training and experience has been directly involved in numerous investigations involving prohibited people possessing firearms, people possessing illegal firearms including machine guns, and people possessing firearms in furtherance of drug trafficking. I have participated in firearm and narcotic investigations at the local, state, and federal levels. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 922(o), and Title 21, United States Code, Sections 841, 843, and 846, have been committed, are being committed, and will be committed by the suspected users of the **TARGET CELLULAR DEVICES**. There is also probable cause to believe that evidence regarding the location of the **TARGET CELLULAR DEVICES** will be probative of the identity of the users of the **TARGET CELLULAR DEVICES**, which will in turn constitute evidence of those criminal violations.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**<u>PROBABLE CAUSE</u>**

8. On July 1, 2024, your affiant obtained a court order signed by the Honorable Pamela Pepper, Chief U.S. District Judge for the Eastern District of Wisconsin, authorizing the interception of wire communications to and from the cellular telephone assigned number **TARGET TELEPHONE 1**, described above as a phone use by Malik NICHOLS. On August 1, 2024, the Honorable Pamela Pepper, Chief U.S. District Judge for the Eastern District of Wisconsin, entered an order authorizing the continued interception of wire communications to and from **TARGET TELEPHONE 1**, and 747-955-6842, a number previously used by Dominique WILLIAMS.

9. During the course of this investigation, case agents have identified several individuals who are believed to be members of, or associates with, Dominque WILLIAMS' Drug Trafficking

Organization. Those individuals, who are the suspected users of the **TARGET CELLULAR DEVICES**, are discussed in turn below.

<u>**MALIK NICHOLS**</u>

10. Previously, during the course of this investigation, on March 26, 2024, the Honorable Nancy Joseph, U.S. Magistrate Judge for the Eastern District of Wisconsin, authorized the use of a cell-site simulator warrant to identify additional devices used by NICHOLS. On April 3, 2024, case agents used the cell-site simulator at three separate locations where NICHOLS was present and identified cellular devices believed to be used by NICHOLS, to include **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**. Case agents then served subpoenas to multiple service providers to identify the phone numbers used by the cellular devices identified by the canvassing cell-site simulator as being used by NICHOLS. Verizon Wireless identified one of the cellular devices suspected to have been used by NICHOLS as phone number 602-989-5138, with a listed subscriber of Malik NICHOLS with an associated business of Royal Glorious Greens, LLC, located at the US Post Office, 5521 W. Center Street, Milwaukee, WI. Additionally, the subpoenaed Verizon records revealed that the "home phone" listed for NICHOLS/Royal Glorious Greens, LLC, was **TARGET TELEPHONE 2**. Finally, an open-source search of Royal Glorious Greens, LLC revealed that its registered agent was Malik Y. NICHOLS.

11. AT&T identified the second cellular device suspected of being used by NICHOLS as **TARGET TELEPHONE 2**. Additionally, as set forth above, NICHOLS identified the Target Cell Phone as his home phone number on his Verizon records for the 602-989-5138 number.

12. On April 26, 2024, your affiant obtained federal search warrants for location information pertaining to the cell phone assigned number 602-989-5138 (24-MJ-106) and the cell

2

phone assigned number 414-416-8334 (**TARGET TELPHONE 2**) (24-MJ-107), signed by the Honorable William Duffin, U.S. Magistrate Judge for the Eastern District of Wisconsin.

13. While case agents were obtaining location information for those devices, case agents determined that NICHOLS was typically possessing all three cell phones at the same time.

14. Additionally, since monitoring the wire communications to and from **TARGET TELEPHONE 1**, case agents have heard several conversations in which NICHOLS was speaking on **TARGET TELEPHONE 1** but there was also a telephone ringing in the background and then NICHOLS could be heard via intercepted wire communications answering a different phone and talking to unknown individuals on speaker phone about drug transactions, among other things.

15. Specifically, the user of the cell phone number 608-239-8215, identified as Anthony HANES, called **TARGET TELEPHONE 1** and pertinent conversations between NICHOLS and HANES regarding narcotics trafficking were intercepted. There have also been several occasions when the cell phone number 608-238-8215 has attempted to call NICHOLS on **TARGET TELEPHONE 1**, but NICHOLS did not answer. Case agents reviewing the wiretap and pen register/trap and trace data determined that after NICHOLS did not answer **TARGET TELEPHONE 1**, the cell phone number 608-238-8215, known to be used by HANES, immediately called **TARGET TELEPHONE 2**.

16. Furthermore, while reviewing toll data and pen register/trap and trace data for all three numbers, including **TARGET TELEPHONE 1** and the **TARGET TELEPHONE 2**, there are several numbers that are consistently being contacted by all three of NICHOLS' known phone numbers. Specifically, **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** both contact NICHOLS' mother, Nichole NICHOLS.

3

17. On July 10, 2024, the Honorable William E. Duffin, U.S. Magistrate Judge for the Eastern District of Wisconsin, signed a federal search warrant for location information pertaining to **TARGET TELEPHONE 2** (24-MJ-150). This monitoring period expired on August 9, 2024. While case agents were obtaining location information for NICHOLS' suspected devices, case agents determined that it appeared that NICHOLS was typically possessing all three cell phones at the same time. However, based upon training, experience, and the investigation to date, including the varying ranges of cell-site location data obtained from various service providers, case agents are aware that NICHOLS may not possess all three cell phones all the time and may inadvertently or purposefully leave one or more cell phone at his residence, when for example, he travels to obtain narcotics from his source of supply. Additionally, case agents are aware, based upon an intercepted communication, that NICHOLS apparently did not pay his phone bill for the 602-989-5138 number, and case agents have not received location information for the 602-989-5138 number since July 24, 2024. They therefore believe that NICHOLS no longer utilizes the device assigned 602-989-5138.

18. On or about July 27, 2024, at approximately 6:10 pm, NICHOLS received a phone call on **TARGET TELEPHONE 1** from WILLIAMS, utilizing 747-955-6842 (**TARGET TELEPHONE 3**). WILLIAMS tells NICHOLS not to have anyone in the trap (which your affiant knows is common slang for a location involved in drug trafficking) and to keep them on the left side. An approximate summary is set forth below.

> **NICHOLS**:   Hello?
>
> **WILLIAMS**: Yeah.
>
> **NICHOLS**:    I got it, I'm at the trap.
>
> **WILLIAMS**: Man. Don't...everybody don't need to be in there right now. [OV]

4

**NICHOLS**: Alright, I know. Everything over there. Just pull out a box. Box at a time.

**WILLIAMS**: No.

**NICHOLS**: Or...

**WILLIAMS**: [UI] same on the other side. He gonna meet you over there. [UI] stayin' on the left side.

**NICHOLS**: Okay.

**WILLIAMS**: [UI] put everything on the right side. Yo I'm finna count everything.

**NICHOLS**: Alright.

**WILLIAMS**: Aight. He finna pull up. So wait til he pull up to go carry shit in the house.

**NICHOLS**: Already got Dez [PH] and [UI] wit me, bro.

**WILLIAMS**: Huh?

**NICHOLS**: Imma just wait.

**WILLIAMS**: I don't want them seein' the other side, you know.

**NICHOLS**: I know, bro. I'm not gonna show them the other side, G. No nobody. So nobody gonna know, bro.

**WILLIAMS**: Trust nobody. [UI] nobody needa see that shit [OV]

**NICHOLS**: Alright.

19. On or about August 29, 2024, at approximately 6:46 pm, NICHOLS received a phone call on **TARGET TELEPHONE 1** from an Unknown Male (UM), utilizing 414-210-9268. The UM asks NICHOLS where he is and tells NICHOLS that he wants a half. NICHOLS tells him that he is on 40th and Ruby and he should pull up. A summary is set forth below.

**U/M**: What it do ?

**NICHOLS**: What's the word?

**U/M**:         where you at?

**NICHOLS**:   Right here on 40th and Ruby

**U/M**:         Alright I just want a little half again, I'll pull up closer.

**NICHOLS**:   alright

20. Approximately three (3) minutes later, the UM calls NICHOLS again and asks which side of 40th, while advising that he is on the Congress side of 40th. NICHOLS replies with the address, 4466 N 40th (Milwaukee, WI). A summary is set forth below.

**U/M**:         Which side I'm on the Congress side

**NICHOLS**:   Yeah, the address is 4466 N 40th.

## DOMINIQUE WILLIAMS

21. The previously mentioned authorized interceptions have demonstrated that WILLIAMS and his associates are engaged in the distribution of controlled substances, including cocaine, methamphetamine, and marijuana. For instance, on August 11, 2024, law enforcement intercepted WILLIAMS, using his previous line of 747-955-6842, speaking with Chauncey King. King asked WILLIAMS, "You'll sell me a zip of Meth?" WILLIAMS said, "Say it again." King repeated, "You'll sell me a zip of the Meth?" WILLIAMS asked, "You said what?" King said, "A zip of the Meth." WILLIAMS replied, "Yea, I want a 100 if you don't buy the pound for 1200." KING stated, "Aight, bring me a zip." In addition to these interceptions related to drug trafficking, law enforcement has observed WILLIAMS at his suspected stash house in the Eastern District of Wisconsin. They have also intercepted conversations wherein WILLIAMS discusses both cash payments and robberies, both believed to be associated with controlled substances.

22. Based upon the location information associated with 747-955-6842, WILLIAMS'

6

previous number, case agents believe that WILLIAMS flew from Chicago O'Hare International Airport to Los Angeles International Airport on August 19, 2024. And based upon that same location information, it appears that WILLIAMS stayed in that District until September 5, 2024.

23. On August 24, 2024, at 9:26 p.m. 747-955-6842, WILLIAMS' previous number, received an incoming call from 310-503-0839, used by an unidentified female ("UF") (subsequently believed to be identified as Alysa PEIFER). WILLIAMS said, "Hello?" UF asked "Hey, what you doing?" WILLIAMS said "Shit, at the crib." The UF asked: "Oh, did you still need your house cleaned?" WILLIAMS responded: "Probably tomorrow." The UF said: "Oh fuck. I can't tomorrow, but the next day I can, Monday. Okay, umm I'm at work but I'll see what you needed." WILLIAMS respond, "Alright." The UF asked, "Also, I have people that want to go… Why what's up with Tae or you or anyone?" WILLIAMS asked: "You wanna drive?" The UF then asked, "How far would it take along?" WILLIAMS responded, "A day." The UF questioned: "One day?" WILLIAMS replied: "Yeah." The UF then asked, "Uh, would I be driving with just weed or something else?" WILLIAMS asked, "What?" The UF responded: "Weed or something else?" WILLIAMS asked, "You calling me, how you calling me?" The UF said: "Hold on," and the call abruptly ended. Based upon their training, experience, and the investigation to date, case agents believe that when the UF started asking WILLIAMS if she would be transporting "weed or something else," meaning another type of controlled substance, that WILLIAMS asked how she was calling him and then she hung up because she was calling him on a regular phone call. I believe that the UF then hung up so she could call WILLIAMS back using an encrypted platform or a platform that cannot be intercepted by law enforcement such as Facetime. Therefore, based upon their training, experience, and the investigation to date, case agents believe that WILLIAMS and the UF were discussing driving controlled substances, i.e., "weed or something else,"

7

(meaning other types of controlled substances) from California to the Eastern District of Wisconsin.

24. On August 26, 2024, at approximately 3:29 p.m., WILLIAMS, using his former number of 747-955-6842, received an incoming call from 310-503-0839, believed to be used by PEIFER. Set forth below is an approximate transcription of the call:

WILLIAMS: What's up?

PEIFER: What's up?

WILLIAMS: Where you at?

PEIFER: I'm at work.

WILLIAMS: I thought you was coming to clean my house today?

PEIFER: I was but I'm fucking irritated, this shit with you and Tae doing this weird shit to me is irritating.

WILLIAMS: What is you talking about?

PEIFER: You know what happened with Tae, your with him.

WILLIAMS: I'm not with Tae, fool.

PEIFER: Well, shits weird, you're not gonna ask me, hey can you get me a girl for this day and then I give him a girl he says ok, make sure she can do this time and this time and make sure she calls off work, get her right and tell him, Ok do I send the money and as soon as its time for me to send the money he goes, just send me her number, I send him the number then, then he says thanks twin, I don't need you now. That's fucked up, that's weird ass shit, I'm over it. I'm not helping you guys make millions of dollars when I'm making zero.

WILLIAMS: [UI] I told you I was gonna have you come to my city.

PEIFER: Yea, that shits not cool, its not fucking right.

WILLIAMS: I don't work that way, you know I don't.

PEIFER: Like that's, he went to her, and he was like I'm contacting her

8

now, thanks twin, I don't need you. Bro I didn't put you together with her for you…

**WILLIAMS**: What is you talking about?

**PEIFER**: With the girl that is gonna go tomorrow, and now I'm making zero off of it because he went behind my back, it's weird.

**WILLIAMS**: Who?

**PEIFER**: He's having Jada go.

**WILLIAMS**: I don't even know who that is.

**WILLIAMS**: You think the niggas who robbed me getting away with that shit?

**PEIFER**: Of course not, but that's you, like jaded, like crazy.

**PEIFER**: Ok, well you're not helping.

**WILLIAMS**: You could come to my city, [UI].

**PEIFER**: I'm down I would have to leave this Saturday night and be back on Tuesday morning.

**WILLIAMS**: [UI] Saturday night.

**PEIFER**: I didn't hear you what you say?

**WILLIAMS**: Amen to that, we finna get up out of here.

**PEIFER**: Well I have to go Saturday, I have work and I can't miss a day with my promotion right now.

**WILLIAMS**: Well, after I finish getting all of this stuff, I'm leaving.

**PEIFER**: Can I meet you there Saturday to help work and do some stuff out there?

**WILLIAMS**: No no no.

**PEIFER**: Why?

**WILLIAMS**: Cuz it don't work like that.

**PEIFER**: Huh?

9

**WILLIAMS**: Once I get there I ain't gon need no help.

**PEIFER**: Bro, ok then you're not gonna help me.

**WILLIAMS**: That's what I'm saying so we gon leave probably tomorrow.

**PEIFER**: I can't.

**WILLIAMS**: I don't give a fuck talking about you can't, that shit ain't paying you no money, you need $8,000 right?

**PEIFER**: Yes.

**WILLIAMS**: Alright then, I'mma get you closer to it.

**PEIFER**: Ok, I'll figure out who can cover my shifts I guess, can I come clean for $500 today?\

**WILLIAMS**: My shit ain't even $500 worth cleaning, all my shit is clothes. Hold on 2 seconds, let me call you back.

25. Based upon my training, experience, and investigation to date, case agents believe that on the intercepted call with WILLIAMS, using 747-955-6842, on August 26, 2024, was speaking with PEIFER regarding potentially transporting controlled substances with or on behalf of WILLIAMS from California to the Eastern District of Wisconsin, in exchange for money ("closer" to the $8,000 needed to pay her bills). Additionally, during the call, WILLIAMS states, "we gon leave probably tomorrow," meaning that the trip from California to the Eastern District of Wisconsin, transporting an unknown quantity of controlled substances, may begin "tomorrow," that is, August 27, 2024.

26. On September 5, 2024, Case Agents discovered WILLIAMS was travelling from Santa Ana, CA to Chicago, IL via a United Airlines flight. WILLIAMS arrived at Chicago O'Hare airport and, utilizing 747-955-6842, called Jasmine GRAY via 414-567-5454 to have her send him an Uber to get him to his residence at 2857 N 26th Street, Milwaukee, WI.

10

27. Once WILLIAMS arrived at his residence located at 2857 N 26th Street, Milwaukee, WI, he entered a vehicle and immediately travelled to 3840 Highway 60, Slinger, WI. Once WILLIAMS was there, he called Jasmine GRAY again, which investigators believe was to let her know that he arrived.

28. The same day, Case Agents conducted a search of the license plate reader system, looking for WILLIAMS' black Mercedes sprinter van, which case agents believed would be transporting illegal substances back to Milwaukee. The van was captured on one of the cameras in Las Vegas, Nevada after it was captured in California the days before.

29. Case Agents contacted the Iowa State Police to conduct a "walled off" traffic stop of the vehicle while it was travelling through Iowa on Interstate 80. On September 6, 2024, the Iowa State Police witnessed the vehicle travelling east towards Wisconsin and observed several traffic violations. The vehicle was stopped. A narcotics detection canine was deployed and subsequently alerted for the presence of narcotics in the vehicle.

30. The driver was removed from the vehicle and the search yielded approximately 24 kilograms of cocaine, 74 pounds of methamphetamine, and a loaded handgun near the driver, who was identified as Dromynique CHESTNUT. CHESTNUT on scene provided a phone number of 213-712-2423. Case agents reviewed the pen register data for 747-955-6842, WLLIAMS' phone at the time, and found several interactions with CHESTNUT via the number provided.

31. CHESTNUT told investigators that he was paid by Domonique WILLIAMS to drive his van from his apartment located at 15 MacArthur Place, Santa Ana, CA to 2857 N 26th Street, Milwaukee, WI. CHESTNUT was told that the boxes located within the vehicle were full of designer clothing. CHESTNUT provided 747-955-6842 as the phone number he had for WILLIAMS.

11

32. After CHESTNUT's arrest on September 6, 2024, through the morning hours of September 7, 2024, WILLIAMS attempted to contact CHESTNUT a total of 46 times from both of his known phone numbers, including 747-955-6842. Shortly after, on September 8, 2024, WILLIAMS' phone stopped making phone calls or messages outbound. Investigators believe that WILLIAMS switched phone numbers and devices after his drugs were recovered by police.

33. Case Agents further believe they have identified WILLIAMS' new number using "common call" analysis. To wit: officers analyzed the most frequent contacts for the prior numbers WILLIAMS had utilized, from 8/13/2024 through 9/13/2024. By comparing the toll records for those numbers before and after 9/7/2024—the approximate date they believe WILLIAMS "dropped" his phones—they identified a common number: Target Telephone 3, (262) 307-3681. This suggests to Case Agents—based on their experience, knowledge of this investigation, and understanding of common communication patterns among drug traffickers— that WLLIAMS new number is Target Telephone 3, (262) 307-3681.

**JERALD CAMPBELL**

34. On July 29, 2024, NICHOLS and CAMPBELL were both observed at 1810 W Atkinson Avenue, Milwaukee, WI. Investigators know NICHOLS and CAMPBELL to operate a narcotics/marijuana stash location on the second floor of the building. CAMPBELL was observed entering the white rear door to the residence which leads to an internal stairwell to the second floor. NICHOLS was observed in the parking lot interacting with two unidentified black males who appeared to solicit clothing and miscellaneous items for sale. During their interaction with NICHOLS, NICHOLS conducted an outgoing phone call (Call Session 5426) at 17:11 to **TARGET TELEPHONE 4**, which is believed to be utilized by Jerald CAMPBELL. CAMPBELL answered the phone, "Hello?", and NICHOLS asked CAMPBELL if he wanted

12

"some white T's, you want some large white T's?". CAMPBELL responded, "You know I don't wear no damn large." NICHOLS asked, "What you wearing… medium?" and CAMPBELL stated, "Medium and smalls." NICHOLS was observed purchasing white T-shirts from the unidentified males with US currency and small corner cut-baggies containing a white substance, which case agents believe to have been controlled substances.



35. Following this intercepted wire communication, case agents reviewed recorded calls conducted by Jerald CAMPBELL while he in custody in the Milwaukee County Jail Facility (CJF). Case agents identified CAMPBELL'S recorded CJF call on 02/26/2019 at approximately 16:09PM and noted the similarity of the voice to the male intercepted on **TARGET TELEPHONE 1,** who had used **TARGET TELEPHONE 4**.

36. Additionally, on July 30, 2024, static surveillance observed CAMPBELL at 1810 W Atkinson Avenue, Milwaukee, WI, known by case agents to be a narcotics/marijuana stash location. CAMPBELL exited the building carrying a large black duffel bag, believed to contain controlled substances, and a small brown shoulder bag along with a pistol equipped with an extended magazine tucked into the right side of his waist band. CAMPBELL also carried two phones and a set of keys in his hands. CAMPBELL walked to the driver's compartment of the Toyota Highlander he regularly utilizes and dropped the duffle bags to the ground. Prior to CAMPBELL opening the door of the Highlander, a controlled phone call to **TARGET TELEPHONE 4** was successfully completed when CAMPBELL immediately looked at one of his phones and answered it. CAMPBELL was observed holding the phone to his ear utilizing his shoulder while he continued to walk around. During the controlled call, CAMPBELL stated that he just got his phone number and confirmed the phone number called during the controlled call (414-745-1857). During the call, CAMPBELL placed the duffle bag in the driver's side rear compartment and closed the rear door to the building, eventually returning to the driver's compartment of the Toyota Highlander. The call then concluded.

14



37. Furthermore, while reviewing toll data and pen register/trap and trace data for **TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4**, law enforcement noticed there are several "common contacts": numbers that are consistently being contacted by all NICHOLS, WILLIAMS, and CAMPBELL's known phone numbers. Specifically, **TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4** all contact the same customer who regularly orders drugs from NICHOLS. Additionally, **TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4** all contact Andre MCKEE, a suspected drug trafficker working in concert with the WILLIAMS Drug Trafficking Organization.

38. CAMPBELLS' drug trafficking habits have been established by virtue of previously

15

mentioned and authorized interception of **TARGET TELEPHONE 1** and static surveillance. Additional examples follow.

39. On August 2, 2024, NICHOLS and CAMPBELL were observed at 1810 W Atkinson Avenue, Milwaukee, WI, known by case agents to be a narcotics/marijuana stash location. At 16:05, CAMPBELL arrived in a black Toyota Highlander and parked in the northwest corner of the lot, facing east. At 17:46, CAMPBELL walked into view from the northwest corner of the lot and lingered in the parking lot with a firearm tucked under his left armpit. CAMPBELL held two phones and appeared to be talking to someone on one of the phones. NICHOLS departed the location. At 18:15, a white Lexus SUV bearing WI plate [ANE9007] parked in the parking lot of 1810 W Atkinson. At 18:22, CAMPBELL entered the rear white door of 1810 W Atkinson. At 18:36PM, CAMPBELL exited the rear white door carrying a cardboard moving box into the northwest corner of the parking lot to the vicinity of the Toyota Highlander. At 18:38, CAMPBELL walked southeast bound across the parking lot from the northwest side, carrying a cardboard moving box. Campbell accessed the front passenger door of the white Lexus SUV. Campbell conversed with the occupant, leaving the cardboard box in the front passenger area and holding an amount of US currency in his left hand. Shortly after the interaction with the CAMPBELL, the white Lexus SUV departed the location. At 18:51, CAMPBELL departed in the black Toyota Highlander.

40. On August 3, 2024, CAMPBELL and NICHOLS were observed at 1810 W Atkinson Avenue, Milwaukee, WI, a previously mentioned narcotics/marijuana stash location. At 12:06, NICHOLS and CAMPBELL exited the rear white door of the building. CAMPBELL carried a clear plastic bag of suspected marijuana under his left arm. Simultaneously, a blue Explorer bearing WI registration [AWZ 6988] travelled southbound on N 18th Street, parking on the west

16

side of the street just south of the parking lot entrance. A black male (UM1), approximately 30-40 years of age, wearing a black t-shirt, dark colored sweatpants, and dark shoes, exited the driver's seat and walked west toward the vicinity of NICHOLS and CAMPBELL. At 12:08, the UM1 walked eastbound back to the vicinity of the Ford Explorer, which departed southbound on N 18th Street. NICHOLS and CAMPBELL walked from the west side of the parking lot to the open rear white door. CAMPBELL no longer carried the bag of suspected marijuana, but the left side of his waistband jutted out and his shirt was pulled over what appeared to be the outline of a handgun magazine. NICHOLS and CAMPBELL entered 1810 W Atkinson, closing the rear white door behind them.

41. On August 3, 2024, at 13:20, a white Honda Accord with heavy window tint, bearing WI registration [AEW4476] travelled southbound on N 18th Street, turning into the parking lot of 1810 W Atkinson parking facing south near the rear white door. At 13:25, CAMPBELL exited the rear white door of 1810 W Atkinson carrying a full black plastic grocery size bag in his left hand and a black handgun under his left armpit. CAMPBELL accessed the front passenger compartment of the Honda Accord and placed the black bag inside the vehicle. CAMPBELL conversed with the occupant(s) and withdrew his left hand, holding an amount of US currency with $100 denominations visible. At 13:29, CAMPBELL closed the front passenger door of the Accord and re-entered the rear white door. The Accord departed, travelling southbound on N 18th Street and westbound on W Atkinson Avenue.

17



42. Based upon my training, experience, and investigation to date, I believe that CAMPBELL's interactions with the occupant(s) of vehicles in the above-mentioned instances to be suspected transactions of unknown controlled substances. On two of the occasions CAMPBELL transacted suspected controlled substances contained within a cardboard box (Aug. 2) and a black plastic grocery bag (Aug. 3) in exchange for US currency observed in CAMPBELL's possession immediately following the interactions. Immediately leading up to the interaction on Aug. 3 with the UM1, CAMPBELL carried a clear plastic bag of suspected marijuana under his left arm. The brevity of the interaction, the historical knowledge regarding 1810 W Atkinson, and the nature in which the interaction was conducted lead case agents to believe these three interactions to be suspected drug transactions.

43. On August 17, 2024, at approximately 3:56 pm, WILLIAMS placed an outgoing call

to CAMPBELL via **TARGET TELEPHONE 4**. CAMPBELL could be heard telling

WILLIAMS that he was being watched for about 6 months. A summary is set forth below.

**WILLIAMS**: Where you at (UI)?

**CAMPBELL**: Dropping the kids back off (UI) trying to get some shit together

**WILLIAMS**: (UI)

*(Background chatter)*

**WILLIAMS**: What? You talking to me? Hello?

**CAMPBELL**: Have been watching you for like six months

**WILLIAMS**: Who said that?

**CAMPBELL**: I got out there to meet with them

**WILLIAMS**: Listen I need you to get some shit together for Zo. You hear me?

*(Background chatter)*

**CAMPBELL**: Talking to Chicken bro. Cuz you gotta call your guys bro I ain't gonna lie bro. Oh some hating ass bitch ass shit I ain't gonna lie bro.

**WILLIAMS**: Who? Who?

**CAMPBELL**: Hello

**WILLIAMS**: Who?

**CAMPBELL**: Trying to lie I ain't gonna lie bro.

**WILLIAMS**: Who?

**CAMPBELL**: Man he finna call me and tell me who right now but you know I be with bro like we do shows together all type of shit bro don't have nothing to do with that shit with bro. He don't even fuck with dude bro they trying to. Bro they got the key fobs to the nigga benz bro. He get wind of it drop the benz they on 24th and locust right now talking about it bro find out we gotta find out who telling who talking. They trying to back door the nigga. They on some hating ass gay ass shit them niggas gay. I stay out the way.

19

**WILLIAMS**: Cuz

**CAMPBELL**: What up cuz?

**WILLIAMS**: I need you mizo some shit. How long you gonna be?

**CAMPBELL**: I'm on my way there now I was dropping my son of at his grandma's house. I got a play. Got 4 5 g's on the floor.

## EUROPE JAMES

44. Case agents, after they began monitoring the wire communications to and from **TARGET TELEPHONE 1**, intercepted wire communications to and from EUROPE JAMES' phone assigned 414-748-1145 (**TARGET TELEPHONE 5**). Case agents checked law enforcement databases and were familiar with the historical listing of **TARGET TELEPHONE 5** to "James, Europe M" at the address 6434 N 106th St, Milwaukee, WI 53224. Additionally, **TARGET TELEPHONE 5** is associated with a CashApp account named "Huncho," with the handle $HunnitGz.

45. A search of the Wisconsin Circuit Court Access (CCAP) revealed JAMES has previously pled "no contest" to the offense of carrying a concealed weapon and has a listed address of 6434 N 106th St, Milwaukee, WI 53224.

46. On July 12, 2024, at approximately 09:59hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by JAMES. The conversation is summarized below.

**NICHOLS**:  Hello?

**JAMES**:  Hey bitch, I'm outside I need a half.

**NICHOLS**:  Bitch I ain't got no smoke, I hope you paid attention to your text messages.

**JAMES**:  The hell? You text me? Bro you just fucking texted me Malik bro!!

20

NICHOLS: What the fuck nigga you got my low but I ain't tell you to pull up!

JAMES: Bro I got your low from your pull up. What the! *Laughs* We bout to go get some smoke together nigga you got me fucked up. It's time to go to the shop, We about to go to the store together... fuck that! Who got some weed bro?

NICHOLS: I don't know I been waiting on Pape to get me weed.

JAMES: Where his bitch ass been at?

NICHOLS: I don't know, bro they been low bro.

JAMES: Domo ass still gone?

NICHOLS: No.

JAMES: There go them boys...

NICHOLS: Ay what you doing around 11 o'clock, 10:30?

JAMES: Uhhh shit, what's the word... It's 10 oclock right now Malik.

NICHOLS: I mean like 10:30.

JAMES: Shit, like what up? I gotta work today at 3:00 but shit I ain't doing shit till then.

NICHOLS: I gotta pick go pick up my rental at a 11.

JAMES: You need a ride?

NICHOLS: Yeah.

47. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES requesting 14 grams, or "a half," of marijuana ("smoke" / "weed") from NICHOLS. NICHOLS stated that he was out of marijuana and was waiting on JERALD CAMPBELL ("Pape") to resupply him with marijuana ("weed"). JAMES asked if DOMINIQUE WILLIAMS ("Domo") was still out of town. NICHOLS proceeded to ask JAMES for a ride to pick up his rental vehicle. Case agents know NICHOLS to obtain and utilize various

21

rental vehicles for use during his mobile drug dealing.

48. On July 15, 2024, at approximately 21:31hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by EUROPE JAMES. A summary is set forth below.

| | |
|---|---|
| **JAMES**: | What you doing cuz? You got some more smokes? |
| **NICHOLS**: | Yup |
| **JAMES**: | Where you at, want me to pull on over there? |
| **NICHOLS**: | Yup |
| **JAMES**: | You got that zap on you? |
| **NICHOLS**: | Yup I gotta get some some baggies bro |
| **JAMES**: | You said to grab you some baggies? |
| **NICHOLS**: | Yeah |
| **JAMES**: | Alright |

49. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES requesting approximately an ounce ("zip") of marijuana ("smoke") from NICHOLS.  NICHOLS and JAMES discuss a meet location for the suspected drug transaction.  NICHOLS directed JAMES to pick up more "baggies," which case agents believe to refer to small Ziploc baggies for the packaging of controlled substances.

50. On August 21, 2024, at approximately 21:22hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Unknown Male, using 414-406-9767.  An approximate summary is set forth below.

| | |
|---|---|
| **NICHOLS**: | Whuddup man, that's why I said buy 7 earlier. |
| **U/M**: | Nah, dog I wasn't even calling your bum ass for that dog. |

22

**NICHOLS**: Awww, what you calling for cuz I was sho finna say

**U/M**: Aye let me know if you run across a button for sale.

**NICHOLS**: A buttons for sale?

**U/M**: Yeah

**NICHOLS**: Aight I gotchu. Imma call you.

*Multiple voices conversed in unintelligible conversation*

**NICHOLS**: I wish you woulda hit your bitch ass Jesse, I ain't gonna lie. Aight I gotchu, I'm finna call my nigga right now and call you right back.

51. Based upon their training, experience, and the investigation to date, case agents believe this conversation to refer to the UM asking to buy a machine gun conversion device (MCD) ("Button") from NICHOLS. NICHOLS stated that he would reach out to an unknown third party.

52. On August 21, 2024, at approximately 21:52hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by EUROPE JAMES. A summary of the conversation is set forth below.

**NICHOLS**: Switchy!

**JAMES**: Where you at cuddy?

**NICHOLS**: Switchy!

**JAMES**: Where you at cuddy?

**NICHOLS**: Right here on 36th and Townsend and headed to 61st and Burleigh

**JAMES**: Hey come to me after that bro.

**NICHOLS**: Aight, hey did you ever find them switch, them buttons?

**JAMES**: Yeah I told him to let me know, when you ready

**NICHOLS**: Alright I got another button for the 1-1 too.

**JAMES**: Let me know when they're ready.

23

NICHOLS:    I think you got a career in this shit.

JAMES:      Man that's my name folks.

NICHOLS:    Man, Buddah want one.  He damn near want that like right now

JAMES:      Who want one?

NICHOLS:    What you gonna charge me for it?

JAMES:      Who want one?

NICHOLS:    Buddah, Nana baby daddy.

JAMES:      Oh shit, he give me like 150

NICHOLS:    Alright I'm finna call him right quick, I'll call you back.

JAMES:      Aight

53. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES and NICHOLS discussing MCD's, also known as a "switch" or "button".  NICHOLS called JAMES by the nickname "Switchy" and stated that JAMES could make a career out of selling MCD's.  The nature of the conversation and reference to "another button," and the statement, "I think you got a career in this shit," leads case agents to believe JAMES has conducted MCD transactions with NICHOLS and others in the past.

54. On August 21, 2024, at approximately 21:52hrs, NICHOLS, using TARGET TELEPHONE 1, made an outgoing call to an Unknown Male, using (414) 406-9767.  A summary is set forth below.

U/M:        yo

NICHOLS:    Hey. Switchy said he got one for 150 for you.

U/M:        150?

NICHOLS:    Yeah 150. I told him I was buyin it

| | |
|---|---|
| **U/M**: | Aight say less |
| **NICHOLS**: | When you gonna want it? Uou don't know yet? |
| **U/M**: | Shit in probably the mornin |
| **NICHOLS**: | Aight whenever Rog, I'll help you put that muthafucka on too |
| **U/M**: | Aight I know how (UI) |
| **NICHOLS**: | Long as you got you a g lock boy that boy gone go right on there |
| **U/M**: Oh yeah I ain't worry that muthafucka goin on there anyway |

55. Based upon their training, experience, and the investigation to date, case agents believe this to refer to the earlier call sessions involving the UM requesting an MCD from NICHOLS. NICHOLS stated that he would reach out to a third party and approximately 30 minutes later a call between JAMES and NICHOLS provided a MCD price which is re-stated in this call session.

56. On August 27, 2024, at approximately 10:15hrs, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to **TARGET TELEPHONE 5**, believed to be utilized by EUROPE JAMES.

| | |
|---|---|
| **JAMES**: | Hello, hello? |
| **NICHOLS**: | What up E? |
| **JAMES**: | You sleeping over there nigga. |
| **NICHOLS**: | No (UI) |
| **JAMES**: | Huh? |
| **NICHOLS**: | No |
| **JAMES**: | Oh, I need a zap bro where you at? |
| **NICHOLS**: | You see where my location is |
| **JAMES**: | You staying there? |

**NICHOLS**:   Pull up

**JAMES**:     Aight

57. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES and NICHOLS discussing a suspected controlled substance transaction. JAMES ordered an ounce ("zap") of an unknown controlled substance.

58. Based upon my training, experience, and investigation to date, I believe that JAMES' intercepted communications with NICHOLS reflect both controlled substance transactions and MCD transactions.

## CHAUNCEY KING

59. Case agents, after they began monitoring the wire communications to and from WILLIAMS' via previous number of 747-955-6842, intercepted wire communication to and from Chauncey KING (414) 254-7701 (**TARGET TELEPHONE 6**). Case agents were familiar with the historical listing of **TARGET TELEPHONE 6** to "King, Chauncey" at the address 4940 N 89th St, Milwaukee, WI 53225. Additionally, **TARGET TELEPHONE 6** is associated with a CashApp account named "Chauncey King," with the handle $Cashh2723. Law enforcement database checks list CHAUNCEY S. KING DOB: 05/27/1994 as previously listing the address, 4940 N 89th St, Milwaukee, WI 53225.

60. A search of CCAP revealed KING is a convicted felon, with additional pending criminal charges, and his provided address is 4940 N. 89th Street, Milwaukee, WI 53225.

61. On August 15, 2024, at approximately 10:35hrs, WILLIAMS' prior number of 747-955-6842 received an incoming call from **TARGET TELEPHONE 6**, believed to have been utilized by KING. Initially an unknown female could be heard in the background.

**KING**:     What is... man... you around somebody

**WILLIAMS**: I had, I told you I came back from South Carolina, I was tired bro

**KING**: I ain't know... look listen... all you gotta do is [UI], I know bro, did you be wanting shit [UI] money fosho bro and you do it too the point where a motherfucker gotta spend a bag, you get what I'm saying bro, [Overlap] sometimes nigga [UI] a little short shit just hear me out bro [UI]. I'm like going off your word bro. That shit I gotta play on like half a pillow bro, that's why I kept calling and shit.

**WILLIAMS**: Bro I got [Overlap].............. I'm finna I'm finna get up bro, I'm finna come out, swear to god.

**KING**: Yeah can you come pull up on my bro.

**WILLIAMS**: Yeah, I got you bro.

**KING**: I got a play like half a pillow bro, that's why I been calling since yesterday shit bro. [UI].

**WILLIAMS**: [UI] Bro I'm coming.

**KING**: Alright, how long you thinking about an hour or something?

**WILLIAMS**: Yeah I'm finna get up now bro.

**KING**: Okay [UI], call me when you pulling up.

**WILLIAMS**: *response was unintelligible.*

**KING**: Don't spin me Dom bro. Im trying to get this shit back going bro, because the price you got them at, I know how it's gonna go and shit gone go right bro. You know I spend my money with you bro, shit just be tight sometimes. Bust a couple plays to get some shit going bro.

**WILLIAMS**: Alright, here I come brudder.

**KING**: Alright.

62. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING checking in on the previously discussed narcotics transaction. KING refers to WILLIAMS by the name "Dom" which case agents believed to refer to a shortened version of DOMINIQUE WILLIAMS.

27

63. On August 15, 2024, at approximately 12:24hrs, WILLIAMS, using his former number of 747-955-6842, made an outgoing call to **TARGET TELEPHONE 6**, believed to have been utilized by KING.

> **KING**:        Hello?
>
> **WILLIAMS**:  *\*response was unintelligible.*
>
> **KING**:        Hello?
>
> **WILLIAMS**:  Yo.
>
> **KING**:        What it do?
>
> **WILLIAMS**:  On my way.
>
> **KING**:        Alright.  I'm waiting on you.
>
> **WILLIAMS**:  Alright
>
> **KING**:        *\*response was unintelligible.*

64. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING checking in on the previously discussed narcotics transaction.

65. On August 15, 2024, at approximately 12:26hrs, WILLIAMS, using his former number of 747-955-6842, received an incoming call from **TARGET TELEPHONE 6**, believed to have been utilized by KING.  A summary of the conversation is set forth below.

> **WILLIAMS**:  What up
>
> **KING**:        What up. Look, this is what i was trying to tell you, bro. You know I got, uh, I got a play down, bro. I got a play on the Four. You get what I'm saying? So I was just gonna buy the eighth, bro. But I'm not trying to, you get what I'm saying?
>
> **WILLIAMS**:  Yeah
>
> **KING**:        I'm not trying to pull up weighing this shit, bro.
>
> **WILLIAMS**:  So what you trying to do? You trying to give me half?

28

**KING**:        Bro.

**WILLIAMS**: (UI). What you want?

**KING**:        Yeah, cause what she wants for half? What you want for half of it?

**WILLIAMS**: *response was unintelligible.*

**KING**:        You already know, just, just, just bring.. look, just bring, uh, just bring, uh, just bring like three. Just bring like three. And then ima do that real quick and then (UI)

**WILLIAMS**: *response was unintelligible.*

**KING**:        That's what I was trying to, that's what I was trying to tell you, (UI) like that bro. I had a play on like two, three halves. That's why I kept calling.

**WILLIAMS**: [UI] I'm finna come there, I'm finna pull up.

**KING**:        I had to, look, I had to, when I was stopped by that zip,  was (UI) to get it and give it to dude, bro (UI) to see what was up with it. That's why I kept, that's why I kept calling.

**WILLIAMS**: Alright (UI).

**KING**:        I had the money in my face. (UI).

**WILLIAMS**: Alright

**KING**:        I know you trying to set up on the phone on that, just bring me, bring, um, bring like three for me. Bring like three. Then I'll come back and I'll buy the rest of them fo sho.

**WILLIAMS**: Alright.

**KING**:        That straight?

**WILLIAMS**: Alright.

**KING**:        Alright

66. Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING discussing the previously discussed narcotics transaction and

29

requesting a larger quantity of suspected methamphetamine.

67. On August 16, 2024, at approximately 01:22hrs, West Allis Police Department arrested KING following a traffic stop in which KING was the driver of a vehicle that initiated a high-speed pursuit after ramming two law enforcement vehicles prior to fleeing. After King was arrested, officers searched his person and the driver's seat area of his vehicle, recovering approximately 79.05g of methamphetamine, 12.85g of fentanyl, 48 Oxycodone pills, 37 Hydromorphone pills contained in various baggies, 2 fentanyl transdermal patches, and 22 Suboxone patches.

68. A search of the entire vehicle yielded the recovery of a black digital scale; a black flip phone in the front passenger door map pocket; and multiple flip phones and a smart phone in the center console cupholder area. The phones were covered in trace amounts of suspected methamphetamine powder. The combination of the digital scale, several cellular phones, and the amount of narcotics, along with the manner in which the narcotics were packaged, is consistent with that of street-level drug distribution.

69. Based upon my training, experience, and investigation to date, I believe that KING's intercepted communications with WILLIAMS concerned suspected controlled substances, namely methamphetamines. These intercepted communications lead up to the day before KING was arrested in possession of a large amount of methamphetamine, among other narcotics. Case agents believe WILLIAMS to be KING's source of supply for the methamphetamines recovered on August 16, 2024.

## ANDRE MCKEE

70. On July 20, 2024, at approximately 17:53, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Andre MCKEE, using (414) 737-2265 (**TARGET TELEPHONE 7**).

30

A summary of the conversation is set forth below.

MCKEE:        Hello?

NICHOLS:      Hey, what it do?

MCKEE:        Whats the word?

NICHOLS:      Where you at?

MCKEE:        The crib.

NICHOLS:      What you got going?

MCKEE:        Shit.

NICHOLS:      Oh, Uh... You ain't find no one with some smoke?

MCKEE:        Hell no, bro.  I'm pissed, bro.  Even the backup nigga's that I was telling you about yesterday, the Jack Frost nigga. He talking about he trying to find some more.  I know what that shit means, that shit over with.

NICHOLS:      You said what?

MCKEE:        The nigga can't even get no more of it... Like we dead in the water, I aint gonna lie to you. We dead in the water.

NICHOLS:      Thats alright, Pluffins will be here tonight.

MCKEE:        Tonight?

NICHOLS:      Yeah, they always come around at night-time, like on the weekends, at the night.  They always come around that time.

MCKEE:        Damn.

NICHOLS:      Think about it, it's been two weeks... It's the weekend...

MCKEE:        You know this for sure or you just hypothetical?

NICHOLS:      Hypothetical, but still... I was already told this personally from Pluffins, Big Pluffins himself.  Already told, I gotta take care of it.

MCKEE:        You said what?

31

| | |
|---|---|
| **NICHOLS**: | That I gotta take care of it. |
| **MCKEE**: | Really, what you mean? |
| **NICHOLS**: | Like, I gotta go get it off the truck and shit..... [UI] Hello? |
| **MCKEE**: | Yeah, when you gotta do it.... So, what going on? |
| **NICHOLS**: | He gonna call me, when he gonna pick it up. And he called and telling me that today, so I'm hoping it's tonight. |
| **MCKEE**: | Okay. |
| **NICHOLS**: | But then, you gonna get to calling G and them, and all them people, Bro. I aint got time for you to be doing that. |
| **MCKEE**: | You already know how that shits gonna go. |
| **NICHOLS**: | No, Bro... Don't call nobody, dude. |
| **MCKEE**: | You should damn near have conversation with Big Pluffins now and go ahead and tell him, listen. Cause let me... Let me... Gone ahead put me whoopty, whopty, Bam, to the side whoopty woo, you know what I'm saying? |
| **NICHOLS**: | No, You not listening to me.... You! Don't go back and tell them. Don't go back and ask or say nothing! |
| **MCKEE**: | About what? |
| **NICHOLS**: | Hell naw, bro... You acting slow, I don't wanna talk to you. |
| **MCKEE**: | Nigga, what you mean? Our conversations stay between us! |
| **NICHOLS**: | You acting like a slow ass person.... Don't call G and say nothing? |
| **MCKEE**: | Why would I call G? |
| **NICHOLS**: | Huh? |
| **MCKEE**: | Why would I call G and say something... I don't give a fuck about none of that. "Hey, is it true, that the plugs in town"...Hell no, I'm passed that, I was doing that when we first started, when I first started. I ain't doing none that shit no more, I'm waiting on a phone call. I just wait for a motherfucker to call me. All that calling motherfuckers, "Is it in yet", "Is it in yet"... You get what I'm saying? |

32

I ain't finna keep irritating a grown ass man. When it's in, he gonna call me and tell me its in, or he's gonna send a text message out like he do every time. You know what I'm saying. I ain't finna bust nobody's chops. I don't know what bro got going.

NICHOLS: I just don't need you to do that.

MCKEE: I'm waiting on you then... Whoever call me first.

NICHOLS: Yeah, So when I get that call tonight, I'm gonna just call you and you can have them.

MCKEE: Alright, I got you.

71. Investigators believe this call reflects MCKEE and NICHOLS discussing a marijuana ("smoke") drought in the area. MCKEE could not find any available marijuana, stating, "The nigga can't even get no more of it... Like we dead in the water, I ain't gonna lie to you." NICHOLS replied, "That's alright, Pluffins will be here tonight," which investigators understood to mean that the marijuana re-up would be occurring that evening or in the near future. NICHOLS explained to MCKEE that he was told that hypothetically "they" would come in on the weekend by "Big Pluffins himself," stating that he had to take care of it. NICHOLS stated that he would have to "get it off the truck and shit" which investigators believe to refer to NICHOLS physically unloading the marijuana re-up off of a truck. NICHOLS then told MCKEE to not call Jerald Campbell ("G") and the others because of the drama that would occur.

72. On July 21, 2024, at approximately 16:21pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from Andre MCKEE using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

NICHOLS: Hello

MCKEE: Bro if you need smoke you need to come to me right now bro. My nigga over here right now with the smoke he got two yings right now. I ain't gonna lie this shit gonna be gone by the end of the day.

33

**NICHOLS**:    Its dope? .

**MCKEE**:    Nigga I'm putting on the menu you know its dope. It's the same nigga, it's the same people we been fucking with. Not Cass, not the little nigga that we met at Pax. Its the other people. This shit dope as a motherfucker nigga. But you have to pull up over here now nigga. I got BC the kid pulling up over here, all the cousin people damn near about to pull up trying to grab this shit right now. That's why I'm trying to call you. I'm blowing your phone up like a bitch. I'm like c'mon nigga c'mon. Got two yings, two different flavors.

**NICHOLS**:    I'm finna pull up and check it out.

**MCKEE**:    Aight

**NICHOLS**:    I ain't paying over two g's though.

**MCKEE**:    You said what?

**NICHOLS**:    I ain't paying over two g's.

**MCKEE**:    You said what?

**NICHOLS**:    I ain't paying over two g's.

**MCKEE**:    That's what he want, he want 2, bro. Let me know you in the back.

**NICHOLS**:    Huh?

**MCKEE**:    Let me know you in the back.

**NICHOLS**:    I'm finna pull up.

**MCKEE**:    Nigga I'm out here this shit look beautiful as fuck. Look answer your Facetime.

73. Investigators believe this conversation reflects MCKEE offering pounds of marijuana ("smoke") to NICHOLS.  MCKEE requested that NICHOLS facetime him to observe the product.

74. On July 22, 2024, at approximately 11:05am, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from Andre MCKEE, using **TARGET TELEPHONE 7**. A summary of that conversation is set forth below.

34

| NICHOLS: | Hello. |
|---|---|
| MCKEE: | What's the word? |
| NICHOLS: | What it do? |
| MCKEE: | Shit, I should use the Jeep? |
| NICHOLS: | I'm taking my rental back today, so I will be in the Jeep. |
| MCKEE: | You said what? |
| NICHOLS: | I'm taking my rental back today so I'm gonna be in the Jeep. |
| MCKEE: | Oh man, what time's the rental? |
| NICHOLS: | (UI). |
| MCKEE: | (UI) you need a ride? (UI). |
| NICHOLS: | (UI) mother fucker. |
| MCKEE: | Alright shit man, let me know if you need anything. |
| NICHOLS: | I need a couple dollas. |
| MCKEE: | I'm already done. |
| NICHOLS: | I ain't got no weed. |
| MCKEE: | I got somebody else that got some more new fire shit...(silence)..they got like (UI) get a ying for like 1850...Uncle Snoop like (UI) the, the strain Uncle Snoop (UI) for ya. That's what I got in my patch right now. This shit, lovely nigga, no problems. He gave me a hive yesterday for 900. |
| NICHOLS: | What you say? |
| MCKEE: | I said he gave me a hive yesterday for 900. This was my, one of my other people. So...nigga...big buds everything. So he'll definitely do... |
| NICHOLS: | Yeah (UI). . |
| MCKEE: | Yeah definitely do a hard one for 18. |

35

> **NICHOLS**:    (UI). Alright, shit. I'm gonna get that paper together. I'll call you.
>
> **MCKEE**:    Alright.

75. Investigators believe this conversation to refer to MCKEE offering various marijuana strains in various amounts and prices. The prices quoted are consistent with pound and half pound amounts of marijuana. NICHOLS stated that he would get the money ("paper") for the purchase.

76. On July 22, 2024, at approximately 11:05am, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Andre MCKEE, using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

> **MCKEE**:    Hello?
>
> **NICHOLS**:    Ay, where you at?
>
> **MCKEE**:    Funna pull up at the house
>
> **NICHOLS**:    Call and get one of them for me
>
> **MCKEE**:    Aight
>
> **NICHOLS**:    The topest
>
> **MCKEE**:    Aight, I got you
>
> **NICHOLS**:    You said 18 right? Or you need more?
>
> **MCKEE**:    I dont know, I don't know for sure, I gotta see
>
> **NICHOLS**:    Man...

77. Investigators believe this conversation reflects price per pound of marijuana that NICHOLS had ordered from MCKEE in a previously intercepted session.

78. On July 27, 2024, at approximately 14:23pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Unknown Male (UM) using (414) 309-3130. A summary of the conversation is set forth below.

36

| NICHOLS: | Hello? |
|---|---|
| U/M: | What up cuz, dog ready he trying to see where you're trying to meet at? |
| NICHOLS: | [UI] |
| U/M: | You said where? |
| NICHOLS: | Y'all gotta pull up, I can't meet ya'll nowhere |
| U/M: | Where I gotta come cuz, i'll come and make everything happen |
| NICHOLS: | Come to 40th and Ruby, How long? |
| U/M: | Shit he coming from Racine bro, you gotta give him at least 20-30 minutes to get here |
| NICHOLS: | aight, you said this nigga name was what? |
| U/M: | JJ, I know him cuz, he good bro. Imma do everything, you ain't gotta do nothing he ain't even gotta see your face |
| NICHOLS: | So you said he wanted the 4 right? |
| U/M: | Yea the 4 and a half |
| NICHOLS: | Alright, how long is that gonna take about an hour? 30 minutes? |
| U/M: | 30-40 minutes cuz. So 40th and Ruby? You got like an address nearby bro, give me an address nearby |
| NICHOLS: | 4466 N 40th |
| U/M: | 4466 N 40th, Bet. |

79. Investigators believe this conversation to refer to the UM ordering up 4.5 ounces of suspected cocaine for a third-party customer located in Racine, Wisconsin. NICHOLS provides 4466 N 40th Street (Milwaukee, WI), which investigators know to be a residence associated with Andre MCKEE, to the UM as the drug transaction location.

80. On August 14, 2024, at approximately 15:15pm, NICHOLS, using **TARGET**

**TELEPHONE 1,** received an incoming call from Andre MCKEE, using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

NICHOLS: Hello?

MCKEE: What it do? (Possibly talking to someone else: Hey tell him I'm pulling up to the car.)

NICHOLS: Huh?

MCKEE: Hello. What's the word.

NICHOLS: What up?

MCKEE: I was just, I was just half asleep. What's the word. You on the way to the meeting?

NICHOLS: Yeah I was. What you got for me?

MCKEE: 20 20 for uh 20 25.

NICHOLS: Some new world order shit.

MCKEE: You gonna keep it going like that. I been, I now, I been having like a little bit of problem with the lows but I mean I aint gonna lie i been getting them off. (UI) be having kinda like (UI).

NICHOLS: You gotta just keep mixing them bro. Fuck them niggas bro.

MCKEE: Yeah. I just gotta keep mixing that shit up.

NICHOLS: I mix it so cold though cause we gotta, we gotta top lightskin. Green

*(overlapping conversation)*

MCKEE: So what you mix... Hold on hold on. So what you mixing, cause you mixing the, you mixing it before hand.

NICHOLS: I'm not mixing it. So what I been doing is. It. OK say they want a zap. I give em a zap with all the flav, same flav, like different flavors. Like so say they buy a zap from you. It catches 7 (UI)...

MCKEE: Oh yeah (UI). Yeah you definitely get it, yeah you definitely get a 7 of the lows.

38

| NICHOLS: | No I', saying I do not. I'm in the front. No I'm finna pull up in the back. |
|---|---|
| MCKEE: | Yeah come to the back. |
| NICHOLS: | I be...hey I finna get this house right across the street from yall. 4467. |
| MCKEE: | Get it. |
| NICHOLS: | I'm definitely finna get it, but it's ah rented out. I was thinking shit. |
| MCKEE: | Man you better grab that mother fucker. |
| NICHOLS: | Ya'll cool with yall house on what. |
| MCKEE: | What the fuck? |
| NICHOLS: | What? |
| MCKEE: | That little nap was well needed, I had that lil nigga running the phones and shit. |

81. Investigators believe that when NICHOLS references getting a house directly across from MCKEE's and stated "4467," he is refencing the house directly across the street from MCKEE's residence at 4466 N 40th Street, Milwaukee, WI.

## ANTHONY HANES

82. On July 2nd, 2024, at approximately 16:42pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Anthony HANES, also known as "Squirrel," using his former number of (608) 239-8215. An approximate summary of that conversation is set forth below.

| NICHOLS: | What up, what do you possibly want g? |
|---|---|
| HANES: | Aye? |
| NICHOLS: | What up? |
| HANES: | Hello? You want me to bring one of these out? |

39

| | |
|---|---|
| **NICHOLS**: | What? |
| **HANES**: | Hello? |
| **NICHOLS**: | What? |
| **HANES**: | We have a ton of bags man. |
| **NICHOLS**: | I can't hear you, what you say? |
| **HANES**: | I was trying to buy a woo, man. |
| **NICHOLS**: | I know, you at work right now, here I come, damn. |

83. Case agents believe this conversation reflects HANES and NICHOLS having cocaine ("woo") located in the residence located at 4414 N 39th Street.

84. On July 10th, 2024, at approximately 12:39pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, again using his former number of (608) 239-8215. A summary of the conversation is set forth below.

| | |
|---|---|
| **NICHOLS**: | Hello. |
| **HANES**: | Aye why you leave for let me go grab my money. I'm tryna go get my woo dog let me go bust my move. |
| **NICHOLS**: | What you mean? |
| **HANES**: | Huh? I'm tryin to grab some paper real quick dog, you just took off, I was asking you a question, you just took off. |
| **NICHOLS**: | So, so what the fuck nigga, go grab the paper. |
| **HANES**: | Huh, I did what, what you say? Hello? What you say? Hello? |

85. Investigators believe this conversation to refer to HANES asking to purchase an unknown amount of cocaine ("woo") from NICHOLS for his own distribution ("let me go bust my move"). NICHOLS tells HANES to get the money for the deal ("Go grab the paper").

86. On August 29th, 2024, at approximately, 13:32pm, NICHOLS, using **TARGET**

40

TELEPHONE 1, receiving an incoming call from HANES, using another number associated

with him (414-213-3454). A summary of the conversation is set forth below.

> HANES: Man I told you what it was man why would you leave? Where you at on Medford? Hello?
>
> NICHOLS: Im about to pull back up.
>
> HANES: Man can I just come get it dog, I gots people to take care of. I got a car, I got gas, I just come get it and go.
>
> NICHOLS: Did you get the shit for the house?
>
> HANES: I got all that man, (UI) 600 dollars. But it's all good I got my twenty. But whats up, how long im in the car. You could have just put the shit on the table I told you I had the money. (UI), where you at dog?
>
> NICHOLS: About to pull up.
>
> HANES: (UI) thats crazy, whatever (UI)....
>
> NICHOLS: Im just pulling up.

87. Investigators believe this conversation reflects HANES inquiring on where NICHOLS

is located, due to HANES wanting to pick up narcotics to serve to his clients.

88. On July 25th, 2024, at approximately, 19:10pm, NICHOLS, using **TARGET

TELEPHONE 1**, received an incoming call from HANES, using (262) 388-1394 (**TARGET

TELEPHONE 8**). A summary of the conversation is set forth below.

> HANES: Dog.
>
> NICHOLS: Hello?
>
> HANES: Hey, text me Domo number real quick.
>
> NICHOLS: Alright, you like to have real people names in front of uh [OV]
>
> HANES: Man, [UI] can you hurry?

89. Investigators believe this call reflects HANES asking NICHOLS for Dominique

41

WILLIAMS a.k.a "Domo's" phone number via text.

90. At approximately 18:32pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, using **TARGET TELEPHONE 8**. An approximate summary of the conversation is below.

| | |
|---|---|
| **NICHOLS**: | Hello? |
| **HANES**: | Hello. |
| **NICHOLS**: | What up? |
| **HANES**: | Yeah, where you at? |
| **NICHOLS**: | 18th. |
| **HANES**: | Aight, I got a couple dollas bout to go get some gas. |
| **NICHOLS**: | [OV] |
| **HANES**: | I'm right here. |
| **NICHOLS**: | [OV] can you bring me my money counter? |
| **HANES**: | I ain't at the house. I go get it, whatever. Man. |
| **NICHOLS**: | Thank you. |
| **HANES**: | Go get me some gas, goin' all the way back over there. Bye. |
| **NICHOLS**: | Shut yo bitch ass up, nig- |
| **HANES**: | I'm on my way. Do you want me to go get it or not? |
| **NICHOLS**: | Yes. |
| **HANES**: | Then what else? |
| **NICHOLS**: | The money counter. |
| **HANES**: | Okay. Honey callin' okay bye. |
| **NICHOLS**: | [UI] |

42

| | |
|---|---|
| **HANES**: | Damn. |

91. Investigators believe this conversation reflects NICHOLS asking HANES to bring NICHOLS' electronic money counter over to 1810 W Atkinson, Milwaukee, WI. HANES conducted numerous deals throughout the day at 1810 W Atkinson, Milwaukee, WI, and investigators believe NICHOLS likely had a large amount of US currency on his person based on static surveillance of drug transactions and the high volume of pertinent calls placed that day.

92. On August 25th, 2024, at approximately 19:29pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, using **TARGET TELEPHONE 8**. A summary of the conversation is set forth below.

| | |
|---|---|
| **NICHOLS**: | Hello |
| **HANES**: | Yeah, right here man, where you at? |
| **NICHOLS**: | I'm at the gas station, getting gas. |
| **HANES**: | Give it to me already. I'm finna go-pull up, can you have it ready? I don't wanna stand out [UI]. A dub. I'll be over there. I gotta turn and I don't know how long it's going to take you. |
| **NICHOLS**: | Aight c'mon, bro, I'm right here bro. |
| **HANES**: | Bro I'm right here too, nigga why you take so long, I'm standing there. |
| **NICHOLS**: | What? |
| **HANES**: | Get a dub out bro, whatever it is. I gotta serve these people. Where you at? |
| **NICHOLS**: | I'm looking at you bro |
| **HANES**: | [UI] how long I gotta stand here. |
| **NICHOLS**: | [UI] 416-8334. |
| **HANES**: | [UI] muhfuckin' gas station, man. |

43

NICHOLS:    I'm right here man!

93. Investigators believe this conversation reflects HANES requesting a $20 of suspected controlled substance from NICHOLS to "serve these people."

## DEVIN EILAND

94. On July 6th, 2024, at approximately 21:36pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin Eiland (EILAND) using (414) 499-6083 (**TARGET TELEPHONE 9**). During that call, they converse about drug customers, amounts, and monetary compensation owed to NICHOLS. An approximate excerpt from the conversation is set forth below.

NICHOLS:    [UI] If I got any heads, Imma send you to 'em.

EILAND:     Yeah, that cool 'cause it's yeah. I gotchu. Alright.

NICHOLS:    Alright five three five yo tax.

95. I believe this conversation reflects NICHOLS stating he will send any drug customers ("heads") to EILAND while NICHOLS heads to SummerFest.  Based on the amount quoted and the context of the conversation, case agents believe the reference to a "tax" of "five three five" indicates EILAND had previously been fronted a controlled substance by NICHOLS, for which he will repay NICHOLS $535.

96. On July 12th, 2024, at approximately 14:15pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin Eiland (EILAND), using **TARGET TELEPHONE 9**.  The conversation references "Xavier" and "Kilos". An approximate excerpt follows:

EILAND:     What it do.

NICHOLS:    What it do.

44

**EILAND**:      Whats the word.

**NICHOLS**:   Where you at.

**EILAND**:      About to pull up by the crib.

**NICHOLS**:   I got to move quick.

**EILAND**:      Right.

**NICHOLS**:   Remember Xavier?

**EILAND**:      Yes.

**NICHOLS**:   He just Face Timed me with three or four Keys. He just got sent to Telegram.

**EILAND**:      Ohh, need that!

**NICHOLS**:   Shit, bust him.  Just bust him, nigga... Sell the P's, sell the P's

**EILAND**:       Lets bounce.

**NICHOLS**:   Young as a bitch, little as a bitch. Young nigga, bet

**NICHOLS**:   He got a scam now he isn't a hoe

**EILAND**:      For sure. I am going to call you in like 20 minutes.

**NICHOLS**:   You ain't on shit if you don't do that now, little dog trying to move them hoe's. Little dog like another like me bro, he not gonna have them that long.

**EILAND**:      [UI]

**NICHOLS**:   [UI]. He is not going to have them that long.

**EILAND**:      Where he at cuz.

**NICHOLS**:   He is on 37th and uhh... Right down the street from you, nigga. Right around the corner.

**EILAND**:      Alright I am finna call.

**NICHOLS**:   What you mean you finna call

| | |
|---|---|
| **EILAND**: | I am going to call "Doda" |
| **NICHOLS**: | Doda, What are you calling him for? |
| **EILAND**: | Yeah, He [UI] That's just my nigga, Either you or him. |
| **NICHOLS**: | You say what? |
| **EILAND**: | We just need a ride real fast |
| **NICHOLS**: | Take a ride real fast? , |
| **EILAND**: | Uh,huh |
| **NICHOLS**: | I am going to call him and play it off like where you at bro. I am coming back. How much you want for them? Where you at? I'll call you back. |
| **EILAND**: Alright | |

97. Investigators believe this conversation refers to "Xavier" as having utilized Facetime to contact NICHOLS, who observed "three or four" kilograms ("keys") of cocaine through the encrypted messaging platform, "Telegram." NICHOLS suggests that EILAND rob ("bust") the unknown male "Xavier" for his product. EILAND stated that he needed a vehicle first. Nothing further regarding this possible heist was noted throughout the following calls.

98. On July 21, 2024, at approximately 21:29pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin EILAND using **TARGET TELEPHONE 9**. An approximate summary of the conversation is set forth below.

| | |
|---|---|
| **EILAND**: | Hello? |
| **NICHOLS**: | What it do? You called? |
| **EILAND**: | Yeah, cuz. Where you at? |
| **NICHOLS**: | Mill Rd., and Sydney. |
| **EILAND**: | I don't even know where the fuck that is. (Inaudible) grab them zips. |

46

> **NICHOLS**:    Alright. Where ya'll at?
>
> **EILAND**:    [UI].

99. Investigators believe this conversation to refer to EILAND ordering up ounces ("zips") of an unknown controlled substance from NICHOLS. NICHOLS agreed and asked what location EILAND was located at.

100.    At approximately 21:41pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to EILAND using **TARGET TELEPHONE 9**. A summary of the conversation is set forth below.

> **NICHOLS**:    Where you at bro?
>
> **EILAND**:    I'm right here on 36th at the gas station, grabbing blunts for bro.
>
> **NICHOLS**:    You buy your actions some blunts?
>
> **EILAND**:    He needed some woods. He finna pay me.
>
> **NICHOLS**:    He apply that to the two zips?
>
> **EILAND**:    Yeah, he wants the two zips.
>
> **NICHOLS**: I'm going to Chipotle. You at the BP.
>
> **EILAND**:    Yup, right here on 36th, coming up on 38th.
>
> **NICHOLS**:    Turn off, I'm right here. He bought the whole two zaps.
>
> **EILAND**:    Yup, he bought the two zaps. I see you right there.
>
> **NICHOLS**:    Wasn't me. I got some long islands in me.
>
> **EILAND**:    Where did you go?
>
> **NICHOLS**:    I went to the fair. Come open the back door.

101.    Investigators believe this conversation to refer to the controlled substance ordered up in a previous session by EILAND. NICHOLS asked if EILAND bought his customer,

("action") some rolled tobacco ("blunts").  EILAND stated that the customer wanted two ounces ("two zips").  The two interceptees then communicate at the meet up location.

102.    On July 28th, 2024, at approximately, 13:42pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from Devin EILAND, using **TARGET TELEPHONE 9**. An approximate excerpt of the conversation is set forth below.

NICHOLS:    Hello

EILAND:    What you doing, pimpin?

NICHOLS:    Heading to the trap.

EILAND:    18th or your crib?

NICHOLS:    18th.

EILAND:     I need a Cutie so I can catch a couple plays, bro.

NICHOLS:    No money on it?

EILAND:    I've been with you, knocking yards down

NICHOLS:    What yards you knock down, you ain't knocked down any yards.

EILAND:    Cuz, them yards knocked down last time [UI] with Domo, I would have been paid you for a Cutie.  I just didn't get paid.

NICHOLS:    Cuz, what work did I see you do?  It's been your birthday the last couple days, I ain't seen you do shit.

EILAND:    I'm talking [UI] I did all that work for no pay, that's why I had no birthday on my birthday.

NICHOLS:    I paid you on Hampton for 41st.

EILAND:    You only gave me 80, cuz... You told me you was gonna give me the rest later.

NICHOLS:    Ain't nobody had a set price on what I was giving them that day.  I paid you for the hours you were there.  You weren't even there for 8 hours.

48

EILAND:        [UI]

NICHOLS:       When I get to 18th, I'm gonna have you pull up.  I'm gonna put
               something together, bro.  Listen bro, dude owe me...

EILAND:        Alright.

NICHOLS:       I ain't trying to come up short, I ain't trying to be missing none of
               my money either, bro. I always gotta cover your ass.

103.    Investigators believe this conversation reflects NICHOLS providing marijuana to

EILAND for him to sell to his customers.  EILAND will, in turn, pay NICHOLS some of the

profits.

## CHARLES BROWN

104.    On July 3, 2024, at approximately 19:59, NICHOLS, using **TARGET**

**TELEPHONE 1**, made an outgoing call to Charles BROWN, using his former number of (262)

693-0877. During that call, law enforcement believes they converse about controlled substances

and associated prices.  An approximate excerpt from the conversation is set forth below.

BROWN:         You owe me a 3.5 man.

NICHOLS:       You don't have to extort me like that.

BROWN:         You owe me a 3.5 man, I told you I gone put the word for you man.

NICHOLS:       How I owe you a 3.5 (UI)?

BROWN:         I said nephew its only right if he go to you man, like that don't even
               make sense, especially he catching your plays man.

NICHOLS:       What?

BROWN:         Huh?

NICHOLS:        Hey you at the crib?

BROWN:         Who me?

NICHOLS:       You over here on the 6th?

> **BROWN**: Yea I'm upstairs.
>
> **NICHOLS**: Alright I'm outside

105. On August 4, 2024, at approximately 19:07, WILLIAMS, usingg his prior number of (747) 955-6842, made an outgoing call to BROWN, using (470) 208-8160, **TARGET TELEPHONE 10.** During this conversation, law enforcement believes they discuss a suspected methamphetamine ("ice") transaction. An approximate expert follows below.

> **WILLIAMS**: What you sleep nigga?
>
> **BROWN**: What's up?
>
> **WILLIAMS**: You sleep cuz?
>
> **BROWN**: [UI]. Yup.
>
> **WILLIAMS**: I need umm, I need some I need some ice.
>
> **BROWN**: How much?
>
> **WILLIAMS**: [UI].
>
> **BROWN**: Huh?
>
> **WILLIAMS**: [UI].
>
> **BROWN**: You want a separate or the same thing?
>
> **WILLIAMS**: Same thing.
>
> **BROWN**: Aight, where you at?
>
> **WILLIAMS**: Across the street.

106. On August 8, 2024, at approximately 21:33, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Charles BROWN, using **TARGET TELEPHONE 10**. During this conversation, law enforcement believes they discuss suspected cocaine ("new shit") and the method by which they could transition that cocaine from its powder to its "hard" or

50

"crack" form ("you gotta know how to shake it"). An approximate expert follows below.

BROWN: Yo.
NICHOLS: That new shit from [UI] nigga [UI]

BROWN: Huh?

NICHOLS: That new shit from them not bad.

BROWN: Yeah huh. Pull up.

NICHOLS: You hear me?

BROWN: Yeah pull up.

NICHOLS: Yeah cause I did some shit bro and everybody calling me [UI].

BROWN: You gotta know how-you gotta know how-you gotta know how to shake it, baby.

NICHOLS: Shake it baby? [UI] losin' weight.

BROWN: Just come over. Imma show you how to shake it the right way.

NICHOLS: You gon-I got these mothafuckas hard as a brick, bro. You gotta do somethin' bro. I ain't gon lie, bro. Man, I ain't even use-I use that one shit that was in that tub cause I thought you still had some left. And the dude [PH] wadn't open, but I needed to get some shit done.

BROWN: Just come over-just come over let me see. Bring it over once.

## TECHNICAL BACKGROUND

107.     Based on my training and experience, I know that US Cellular, T-Mobile, Verizon, and AT&T (collectively, the Service Providers) can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **TARGET CELLULAR DEVICES**, including by initiating a signal to determine the location of the **TARGET CELLULAR DEVICES** on their respective networks or with such other reference points as may be reasonably available.

## Cell-Site Data

51

108.    In my training and experience, I have learned that the Service Providers are companies that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

109.    Based on my training and experience, I know that the Service Providers can collect cell-site data on a historical and prospective basis about the **TARGET CELLULAR DEVICES**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

**<u>E-911 Phase II / GPS Location Data</u>**

110.     I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

111.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

112.     I also know that certain wireless providers, such as the Service Providers, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

113.     Based on my training and experience, I know that certain Service Providers also can collect per-call measurement data, which they also refer to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based

upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

114.    Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of the **TARGET CELLULAR DEVICES**, including by initiating a signal to determine the location of the **TARGET CELLULAR DEVICES** on their respective network or with such other reference points as may be reasonably available.

## Pen-Trap Data

115.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

116.    Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number)

54

provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

117.    In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELLULAR DEVICES** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between and among members of the Williams DTO is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether members of the Williams DTO acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## **AUTHORIZATION REQUEST**

118.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

119.    I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

55

120.    I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the locations of the members of the Williams DTO on the Service Providers' networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

121.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the members of the Williams DTO would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

122.    Because the warrant will be served on the Service Providers, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution

of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELLULAR DEVICES** outside of daytime hours.

## ATTACHMENT A-1

### Property to Be Searched

1.      Records and information associated with the cellular device assigned **414-416-8334** ("Target Cell Phone #2"), **414-745-1857** ("Target Cell Phone #4"), **(414) 737-2265** ("Target Cell Phone #7"), and **414-499-6083** ("Target Cell Phone #9"), that are in the custody or control of T-Mobile (the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.      Target Cell Phone #2.

3.      Target Cell Phone #4.

4.      Target Telephone # 7.

5.      Target Cell Phone #9.

**ATTACHMENT A-2**

**Property to Be Searched**

1.      Records and information associated with the cellular device assigned **262-307-3681** ("Target Cell Phone #3") **470-208-8160** (Target Cell Phone #10), that is in the custody or control of Verizon (the "Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.      Target Cell Phone #3.

3.      Target Cell Phone #10.

**<u>ATTACHMENT A-3</u>**

**Property to Be Searched**

1.      Records and information associated with the cellular device assigned **262-993-0926** ("Target Cell Phone #1"), that is in the custody or control of US Cellular (the "Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.      Target Cell Phone #1.

## **ATTACHMENT A4**

### **Property to Be Searched**

1.     Records and information associated with the cellular device assigned **414-748-1145** ("Target Cell Phone #5") **262-388-1394** (Target Cell Phone #8), that is in the custody or control of AT&T (the "Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.     Target Cell Phone #5.

3.     Target Cell Phone #8.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachments A:

    a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period from March 26, 2024, to the date of this warrant:

        i.   Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

62

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones, including:

   (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well specialized location data including LOCDBOR, Timing Advance, RTT, or similar.

b. Information associated with each communication to and from the **TARGET CELLULAR DEVICES** for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELLULAR DEVICES** will connect at the beginning and end of each communication, as well as specialized location data including LOCDBOR, Timing Advance, RTT, or similar.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phones.

c. Information about the location of the **TARGET CELLULAR DEVICES** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and

63

with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of Title 18, United States Code, Section 922(o), and Title 21, United States Code, Sections 841, 843, and 846, involving Malik Nichols, Dominique Williams, Jerold Campbell, Europe James, Andre McKee, Anthony Hanes, Devin Eiland, Charles Brown, Chauncey King, and other unidentified subjects during the period from March 26, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

64